UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re                                                                   Chapter 11

97 2nd LLC,                                                          Case no. 17-74756

Debtor.
-----------------------------------------------------x

**NOTICE OF HEARING**

PLEASE TAKE NOTICE, that a hearing will be held on October 18, 2017 at 1:30 p.m. (the "Hearing") before the Honorable Robert E. Grossman at the United States Bankruptcy Court, 290 Federal Plaza, Central Islip, New York 11722 to consider the annexed application of 97 2nd LLC to dismiss this case under to sections 1112 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE, that the exhibits to the application are too voluminous to attach, but are available upon request made to the undersigned.

PLEASE TAKE FURTHER NOTICE, that objections, if any, must be in writing, served upon the undersigned, and filed with the Clerk of the Bankruptcy Court, with a courtesy copy to the Honorable Robert E. Grossman's chambers, so as to be received at least seven (7) days prior to the Hearing date.

Dated: New York, New York
September 10, 2017

BACKENROTH FRANKEL & KRINSKY, LLP

By: s/ Mark Frankel
800 Third Avenue
New York, New York 10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re Chapter 11

97 2nd LLC Case no. 17-74756

Debtor.
-----------------------------------------------------x

**MOTION TO DISMISS**

97 2nd LLC, the debtor ("Debtor"), as and for its application for an order dismissing this case under section 1112 of the Bankruptcy Code, respectfully represents as follows:

**(a) This case should be dismissed because the Debtor did not authorize a bankruptcy filing or the retention of Tim Ziss as Restructuring officer or Goldberg Weprin Finkel Goldstein, LLP as attorneys,**

**(b) The Debtor's Membership Interests were originally owned by Raphael Toledano, but at a UCC sale on April 4, 2017, the interests were sold to 22 Columbus Avenue LLC,**

**(c) Following the transfer of the Debtor's Membership Interests, 22 Columbus appointed Michael Shah as the Debtor's manager,**

**(d) Toledano then tried to extort $2,000,000 from Mr. Shah by threatening to seize the Property and take the rental proceeds,**

**(e) The Supreme Court of New York County promptly enjoined Mr. Toledano from interfering with 22 Columbus' rights in the Property,**

**(f) Tim Ziss nonetheless filed this case as Toledano's agent, erroneously relying on a letter agreement between Toledano and one of 22 Columbus' former members – but the agreement gave Toledano no managing member rights, and**

**(g) Filing an unauthorized bankruptcy as retaliation for an alleged breach of the letter agreement is sanctionable, and the Court should retain jurisdiction to hear an application under Bankruptcy Rule 9011.**

## BACKGROUND

1. On August 3, 2017, a Chapter 11 petition for 97 2nd Ave LLC ("Debtor") was filed. It was executed by Tim Ziss as "Restructuring Manager" and Goldberg Weprin Finkel Goldstein LLP ("GWFG"), as Debtor's attorneys.

2. The Debtor is a shell entity with no assets.

3. In 2014, the Debtor was formed to purchase the real property at 97 2nd Avenue, New York, New York (the "Property"). When formed, Raphael Toledano owned 100% of the Debtor's membership interests ("Debtor's Membership Interests"). Pictured below are photos of the Property with Raphael Toledano posing in the foreground for an August 7, 2017 story on this bankruptcy on the RealDeal.com website.



**(a) The Debtor's membership interests were originally owned by Raphael Toledano, but at a UCC sale on April 4, 2017, the interests were sold to 22 Columbus Avenue LLC**

4. On or about April 23, 2015, Toledano pledged the Debtor's Membership Interests as collateral for a loan from Lefko Funding LLC ("Lefko") to West 16th Street Owner LLC, for Toledano's acquisition of a non-Debtor property. He defaulted on the loan. On April 4, 2017, Lefko sold the Debtor's Membership interests at a UCC auction sale. Lefko was the successful bidder. (The transcript of the sale is annexed as Exhibit 1 to the Shah Affidavit, which is Exhibit A to this Motion.)

5. Lefko assigned its successful bid to 22 Columbus Avenue, LLC ("22 Columbus") and filed a UCC notice of the transfer on April 14, 2017. (Exhibit 2 to Shah Affidavit annexed hereto as Exhibit A).

6. Toledano ratified the transfer of the Debtor's Membership Interests to 22 Columbus by executing an estoppel certificate on June 7, 2017, and a transfer tax statement dated June 19, 2017. (Exhibit B).

7. In the June 7, 2017 estoppel certificate, Toledano confirmed that the sale of the Debtor's Membership Interests was conducted with "due notice," in a "commercially reasonable manner," "in full compliance" with the UCC and that "22 Columbus Avenue, LLC, a New Jersey limited liability company is the sole owner of the [Debtor]." *Id*.

**(b) Following the transfer of the Debtor's Membership Interests, 22 Columbus appointed Michael Shah as the Debtor's manager**

8. Shah acquired the 22 Columbus membership interests. (Exhibit 3 to Shah Affidavit annexed hereto as Exhibit A). 22 Columbus then appointed Michael Shah as the Debtor's Manager. Exhibit C.

9. On June 20, 2017, the Debtor, by Michael Shah as manager, executed a deed transferring ownership of the Property to DS 97 2nd Ave Property Owner LLC ("New Property Owner"), an affiliate also controlled by Michael Shah. (Exhibit 4 to Shah Affidavit annexed hereto as Exhibit A).

**(c) Toledano tried to extort $2,000,000 from Mr. Shah by threatening to seize the Property and take the rental proceeds**

10. Almost immediately after New Property Owner took title on June 20, 2017, Yaron Kornblum, an attorney representing Toledano, emailed William Weisner, New Property Owner's attorney. He demanded a payoff letter in apparent contemplation of a sale of the Property. Exhibit D. Kornblum sent Weisner the demand presumably because DS 97 2nd Ave Note Purchaser, another entity Shah controls, is the assignee of the approximate $9,000,000 senior mortgage on the Property. Mr. Kornblum sent a follow up email on June 23, 2017. Exhibit D.

11. Mr. Shah obviously knew of Mr. Toledano. He also knew about the May 15, 2017 New York State Attorney General pleading quoted below, filed in the Southern District of New York Bankruptcy Court (Exhibit E), describing Mr. Toledano's real estate career:

Conviction for aggravated assault

> Toledano was a 25-year-old convicted felon, who had been sentenced to two years' probation for a felony of aggravated assault in 2012, as well as arrested in 2009 on felony charges (later dismissed) of "theft by deception" for an alleged scheme to fraudulently withdraw money from a bank.

Making misrepresentations to solicit real estate deals

> Toledano had engaged in misrepresentations in the course of his real estate business. Among other practices, Toledano repeatedly misrepresented himself as an attorney, and as an agent for established real estate developers, in his efforts to drum up possible real estate deals. *Id.* p. 16

Harassing tenants to surrender rent-regulated apartments

> Toledano had been accused of harassing tenants, many of whom were immigrant families, at that property in an effort to pressure tenants into surrendering their rent-regulated apartments. *Id.* p. 13.
>
> As alleged in the Verified Petition, Toledano engaged in the following tactics: he employed private investigators and others to harass tenants and dig up information that he could use to try to evict them; threatened to file baseless eviction cases against tenants; locked tenants out of their homes; increased their rents without regard to the protections of New York's rent stabilization laws; withheld essential services, including gas, hot water, and heat; rendered the building uninhabitable by performing dangerous construction and demolishing the building; and falsely reported tenants to the police for illegal activities. Tenants ultimately signed a confidential settlement agreement reportedly worth over $1 million with Toledano in or about May 2016. *Id.* p. 21
>
> As a result of Toledano's lack of funds, and his need to turn over units at an unrealistic pace, Toledano embarked on a strategy of fraudulently inducing tenants into signing surrender agreements that he had no intention of satisfying, a scheme that was recently the subject of a report in the New York Times. *Id.*
>
> This misconduct violates New York City's tenant harassment law, which forbids landlords from seeking buyouts while threatening or intimidating tenants, or while "knowingly falsifying or misrepresenting any information provided" to the tenant. *See* N.Y.C. Admin. Code § 27-2004(48)(f-3). *Id.* p. 22

Frivolous litigation Tactics

> Toledano also resorted to harassment and frivolous litigation tactics in order to increase his turnover rate, much as he had done at 444 East 13th Street. For example, multiple tenants have complained to NYAG that Toledano and his agents wrongly accused them of not living in these apartments as primary residences. In such cases, Toledano and his agents threatened, or actually filed, holdover cases seeking to evict such tenants. *Id.*

Illegal apartment reconfiguration plans to create tiny illegal bedrooms

> After vacating apartments, in the manner described above, Toledano planned to renovate and reconfigure these units in order to increase rents. Madison and Toledano agreed on an aggressive construction plan that would carve up apartments by adding 1, 2 or even 3 new bedrooms, essentially turning long-standing and desirable housing for families and long-time East Village residents into dormitories for students or transient white collar workers . . . In fact, many of the proposed renovation plans violated New York City law, as both Toledano and Madison knew or should have known, because they created rooms without windows or less than the minimum size for a bedroom under New York City law. *Id.* 22-23

Constant and unsafe construction work to coerce tenants to vacate

> Toledano repeatedly used the threat and reality of constant and unsafe construction work in his efforts to harass and coerce tenants into vacating these properties. *Id.* 23

Exposing tenants to illegal hazardous lead dust

> Lead testing at all three building found that tenants were being exposed to construction dust contaminated with lead; dust collected at all three building displayed lead levels above the threshold (40 micrograms per square foot) that State and Federal environmental agencies consider an unacceptably hazardous level. *Id.* 24

Withholding heat, hot water, superintendents, repairs

> The Debtors' unpaid bills prompted numerous complaints from tenants, who contacted NYAG around the time of the filing of these Petitions to complain repeatedly about lack of heat and hot water, utility shutoff notices, lack of supers, and inadequate repairs and services at the buildings. *See, e.g.*, Lee Aff. ¶ 15.

These shortcomings are also documented by the numerous property violations that have accumulated on these buildings. *Id.* at 26.

12. Mr. Shah brushed off Toledano's demand to sell the Property. Mr. Weisner responded to Mr. Kornblum by email dated June 26, 2017, stating that Mr. Toledano had no rights in the Debtor or the Property. Exhibit F. Mr. Shah hired a security company to guard the Property.

13. It was money well spent.

14. On June 30, 2017, during a telephone call with Toledano, Toledano told Shah he would instruct tenants not to pay rent to New Property Owner. He also said: "I will bury you, literally. I will bury this building and make sure of it." Shah Affidavit, Exhibit A.

15. That night, some Toledano cohorts attempted to break and enter the Property. Steven Morales, the newly hired security guard, caught them in the act. The perpetrators quickly confessed to Mr. Morales that they worked for Toledano. See Morales Affidavit, Exhibit G.

16. In a call a week later on July 6, 2017, Toledano again threatened to contact tenants of the Property and divert rent payments. Toledano demanded $2,000,000, in his words, as "extortion." Besides Mr. Shah, Charlie Oshman and Rohun Khanna listened to the call on speakerphone. See Oshman Affidavit, Exhibit H.

**(d) The Supreme Court of New York County promptly enjoined Mr. Toledano from interfering with 22 Columbus' rights in the Property**

17. New Property Owner filed a complaint against Toledano on July 10, 2017 with an application for injunctive relief. (Exhibit I). On July 12, 2017, the Supreme Court entered a temporary restraining order against Toledano ("TRO," Exhibit J), enjoining Toledano from interfering with New Property Owner's rights in the Property. Toledano and Kornblum, his counsel, were notified of the TRO application by email (Exhibit K). As of this date, Toledano has successfully ducked service of the signed TRO. The TRO, however, is electronically filed in the New York County Supreme Court. Presumably Kornblum notified GWFG and Toledano that it had been entered.

18. The TRO enjoins Toledano from entering the Property, communicating with tenants, collecting rent, or interfering with New Property Owner's ownership rights:

> RAPHAEL TOLEDANO is directed not to: (i) enter the Property or attempt to enter the Property; (ii) contact or communicate in any manner with any tenants of the Property; (iii) collect or attempt to collect any rent from any tenants of the Property; (i) take any action that is inconsistent with Plaintiffs ownership of the Property; (v) interfere with Plaintiffs rights as the owner of the Property; or (vi) instruct, allow, encourage or acquiesce to any other person or entity to do any of the foregoing.

*Id.*

**(e) Tim Ziss filed this case on Toledano's behalf, relying on a purported side letter agreement between Toledano and Benjamin Lefkowitz, one of 22 Columbus' pre-transfer members, but the rights allegedly transferred did not include managing member rights**

19. On July 14, 2017, two days after the TRO was entered, Kevin Nash of GWFG called the undersigned to request a settlement meeting with Shah. During the call, Mr. Nash disclosed the existence of an agreement between Toledano and Benjamin Lefkowitz of Lefkow Funding LLC, the creditor that conducted the UCC sale of the Debtor's Membership Interests, and an original member of 22 Columbus before its membership interests were transferred to Shah. On that day, Shah first discovered the existence of the purported June19, 2017 agreement between Toledano and Lefkowitz (the "Toledano Lefkowitz Agreement," Exhibit L).

20. The parties to the Toledano Lefkowitz Agreement are Benjamin Lefkowitz and Raphael Toledano. Neither 22 Columbus nor 97 2nd LLC is a party to this secret agreement. The opening paragraph confirms that Lefko Funding LLC made a $2,000,000 Loan to West 16th Street Owner LLC on April 23, 2015, secured by (a) a mortgage on real property at 125 West 16th Street, (b) the Debtor's Membership Interests, and (c) Mr. Toledano's personal guaranty. *Id.*

21. In paragraphs (i) through (iii) Toledano acknowledged and ratified 22 Columbus' ownership of the Debtor' Membership Interests following the UCC sale on April 5, 2017. *Id.* Annexed to the agreement is the June 7, 2017 estoppel certificate (Exhibit 2 to Shah Affidavit, Exhibit A hereto) that leaves no doubt about such ratification.

22. In the Local Rule Affidavit filed with the Petition, (Exhibit M), Mr. Ziss highlighted paragraph (iv) of the Lefkowitz Toledano Agreement. In that paragraph, Lefkowitz purportedly agreed that "Raphael Toledano or his designees shall be appointed as manager of the building of the 2nd Avenue Property, which shall include the right to manage and maintain the building and collect all rents from tenants located at the 2nd Avenue Property. . . until the expiration of the Sale Period." The Sale Period is 75 days commencing on the June 19, 2017 date of the agreement, and ending on September 5, 2017. (Exhibit L).

23. Paragraph (iv) did _*not*_ give Toledano rights as a manager of _*the Debtor*_. It purported to give Toledano the right to be hired as manager of _*the building*_. Even this was ineffective, as only Debtor, as owner of the Property, could appoint a building manager. Mr. Lefkowitz in his personal capacity had no right, power or authority to do so.

24. Mr. Ziss also highlighted paragraph (v). Paragraph (v) obligated Lefkowitz and his affiliates "[i]n connection with the sale of the [Debtor's Membership Interests] or the [Property]" to (A) ensure execution of documents and "take other reasonable steps necessary" to effectuate the sale, and (B) upon 24 hours written notice, to deliver releases of (1) certain UCC lens held by Abraham Lokshin, Naum Lokshin and A&N Funding Co. LLC and (B) a certain sale contract between the Debtor Michael Taubenblatt. Yaron Kornblum was assigned to negotiate the sale. The sale proceeds were to be paid to Toledano or his designee. The deadline for Toledano to exercise his rights was the end of the Sale Period (i.e. until September 5, 2017).

25. Under Paragraph (v), Toledano, through Kornblum, ostensibly had the right for 75 days to demand that *Lefkowitz* obtain and deliver executed documents (i) transferring

either the Debtor's Membership Interests or title to the Property, (ii) terminating certain UUC filings made by third party creditors, and (iii) releasing a prior sale contract to a Michael Taubenblatt. Whatever the intent of Paragraph (v), it did *not* give Toledano rights as Debtor's managing member.

26. In summary, whether Mr. Toledano has claims against Lefkowitz (or anyone else) arising from the Toledano Lefkowitz Agreement is a distraction from the inconvenient truth that only Shah had authority as the Debtor's manager to authorize the Debtor's bankruptcy Petition.

**(f) This case must be dismissed because the Debtor did not authorize a bankruptcy filing nor the retention of Tim Ziss as Restructuring officer nor Goldberg Weprin Finkel Goldstein, LLP as attorneys**

27. A bankruptcy court lacks jurisdiction over a bankruptcy case unless the individuals asserting the right to act on behalf of the debtor have authority under applicable state law and the entity's governance instruments. *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945). If the bankruptcy court finds that those who purport to act on behalf of a debtor have not been granted authority by law to institute bankruptcy proceedings, it has no alternative but to dismiss the petition. *Price* at 106.

28. The rule in *Price* was codified in Section 1112(b) of the Bankruptcy Code, as shown by the uniform weight of authority holding that "cause" exists to dismiss a bankruptcy filed without authority. *E.g., In re Pasta Bar by Scotto II, LLC*, No. 15-12766, 2015 Bankr. LEXIS 3941, at *2 (Bankr. S.D.N.Y. Nov. 19, 2015) ("[T]he filing of the chapter 11 petition in this case was not properly authorized. Therefore, the Dismissal Motion is granted."); *In re NNN*

*123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("In addition to 'cause' under § 1112(b), lack of corporate authority to file is an independent ground for dismissal of a bankruptcy case filed by a corporation."); *In re S&R Grandview LLC*, No. 13-03098, 2013 Bankr. LEXIS 4182, at *10 (Bankr. E.D.N.C. Oct. 4, 2013) (dismissing a Chapter 11 case where the petitioner did "not have authority to file a bankruptcy petition on behalf of the Debtor"); *see In re G.T.L. Corp.*, 211 B.R. 241, 245 (Bankr. N.D. Ohio 1997) (the court must ignore a party's consent to an involuntary petition where such party had no authority to act on behalf of the debtor).

29. The threshold issue is whether Mr. Ziss and GWFG possessed the authority to sign and file the Debtor's petition. In *In re East End Development, LLC* 491 B.R. 633, 639-40 (Bankr. E.D.N.Y. 2013), this Court explained the legal standard:

> The Supreme Court has opined that with respect to corporations, the entity vested with "the power of management" has the requisite authority to file a bankruptcy petition. *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945). State law governs whether a business entity is authorized to file a petition in bankruptcy. *In re Am. Globus Corp*., 195 B.R. 263, 265 (Bankr.S.D.N.Y.1996); *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr.D.Or.2003). Therefore, if the Managing Member did not have the authority to file the petition pursuant to applicable state law, then the Debtor's case is subject to dismissal. *In re Raljoed Realty Co.*, 277 F.Supp. 225, 226 (S.D.N.Y.1967) *aff'd per curiam sub nom. In re Park Towers Corp*., 387 F.2d 948 (2d Cir.1967). The Debtor is a New York limited liability company, and resolution of this issue is governed by New York state law. Under New York Limited Liability Company Law, the LLC's operating agreement governs the parties' conduct. To the extent the agreement is silent, there are default provisions in the New York Limited Liability Company laws that apply. *Overhoff v. Scarp, Inc.*, 12 Misc.3d 350, 359, 812 N.Y.S.2d 809 (N.Y.Sup.Ct.2005).
>
> Under New York law, interpretation of the Operating Agreement is governed by several constructs:
>
> > 'It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical

> interpretation to the language employed and the parties' reasonable expectations.' *Howard v. Howard*, 292 A.D.2d 345, 345, 740 N.Y.S.2d 71 (2d Dep't 2002). 'Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add or vary the writing.' *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). That said, in analyzing contractual test, a court need not turn a blind eye to context. Rather, 'a court should accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'' *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (*quoting William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927) (second alteration in original)). 'A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plan meaning of the language chosen by the contracting parties.' *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co*., No. 09 Civ. 1796(GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (citation omitted).

*In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y.2013)

30. Annexed as Exhibit N is the Debtor's operating agreement. As in *East End*, it is governed by New York law, and it contains no provision specifying the required consents for a bankruptcy filing. Instead, the managing member has broad discretion, and a grant of authority to act on the Debtor's behalf. Under paragraph 5, "The Manager is authorized to execute any and all documents on behalf of the Company necessary or appropriate in connection with the acquisition, financing; operation, management or development of the business and any property of the Company."

31. Also under paragraph 5, the Debtor's members select the manager. Here, 22 Columbus Avenue LLC is the Debtor's sole member, as evidenced by

(a) the transcript of the April 4, 2017 UCC sale, Exhibit 1 to Exhibit A,

(b) the April 13, 2017 UCC transfer notice, Exhibit 2 to Exhibit A,

(c) the June 7, 2017 estoppel certificate executed by Toledano, Exhibit B,

(d) the June 18, 2017 transfer tax statement executed by Toledano, Exhibit B,

(e) the introductory paragraph of June 19, 2017 Toledano Lefkowitz Agreement, Exhibit L, and

(f) Ziss' acknowledgement in the Local Rule Affidavit. Exhibit M.

Michael Shah, in turn, is the Debtor's duly appointed manager as evidenced by the August 20, 2017, resolution of 22 Columbus, as the Debtor's sole member, appointing Michael Shah as the Debtor's sole manager. Exhibit C.

32. The resolution authorizing the Chapter 11 filing was executed by Tim Ziss. Exhibit O. It is a nullity because Ziss lacked authority to act on the Debtor's behalf. He claims Toledano gave him authority, but Toledano had no authority. Only Shah, as the Debtor's manager, had authority to file this case. Curiously, Mr. Ziss testified at the 341 meeting that he had never met Mr. Toledano. He has no personal knowledge of any statement made on Toledano's behalf. The facts stated in the corporate resolution Ziss signed were communicated second-hand through GWFG.

33. Both Ziss and GWFG were hired without authority. They lacked authority to file this case, and they lack authority to act on the Debtor's behalf in this Court. Since Shah did not consent to the filing or to the hiring of Ziss or GWFG, the case must be dismissed.

**(g) Filing an unauthorized bankruptcy as retaliation for an alleged breach of the letter agreement is sanctionable, and the Court should retain jurisdiction to hear the Movant's application under Bankruptcy Rule 9011**

34. Filing a fraudulent unauthorized bankruptcy petition is a felony. 18 U.S.C. 157(1), (2); *See United States of America v. Halal Ahmed and Phyliss Seemongol*, 10-cr-00070 (E.D.N.Y 2010) (Four counts of bankruptcy fraud for filing unauthorized bankruptcy petitions)*; Man Sentenced To Five Years For Filing Unauthorized Bankruptcy*, 32 No. 20 Bankr. Ct. Dec. News 7 (1998).

35. The bankruptcy courts deter unauthorized petitions with sanctions under Bankruptcy Rule 9011. *E.g. In re Lamar Crossing Apartments, L.P.*, 464 B.R. 61 (B.A.P. 6th Cir. 2011) (chief manager of former general partner ordered to pay $42,299.08 under Rule 9011 for filing unauthorized bankruptcy); *In re mpX Tech., Inc.*, 310 B.R. 453, 458-59 (Bankr. M.D. Fla. 2004) (corporation president, who had been informed of his removal by majority shareholders, is subject to Bankruptcy Rule 9011 sanctions for filing bankruptcy petition without the authority of the board of directors); *In re Zaragosa Props., Inc.*, 156 B.R. 310, 313-14 (Bankr. M.D. Fla. 1993) (Bankruptcy Rule 9011 sanctions mandated where individual filed petition with no authority to file a bankruptcy petition on the debtor's behalf); *In re D & V Const., Inc.*, 150 B.R. 362 (Bankr. W.D. Pa. 1993) (debtor and counsel violated Bankruptcy Rule 9011 by filing bankruptcy petition on behalf of debtor without authority, thus warranting sanctions); *In re AT Eng'g, Inc.*, 142 B.R. 990 (Bankr. M.D. Fla. 1992) (Attorney's filing of Chapter 7 petition on behalf of corporate debtor warranted imposition of sanctions under Bankruptcy Rule 9011, where attorney fully knew of fact that debtor's president had no power or ability to place corporation into bankruptcy).

36. Here Ziss and GWFG executed the Debtor's Petition with no authority from Michael Shah, the Debtor's sole manager.

37. Ziss acknowledgeed that the Debtor's Membership Interests are held by 22 Columbus in the Local Rule Affidavit. He knew that Michael Shah acted as manager on the Debtor's behalf to transfer the Property to New Property Owner. Yet he based his authority to file this case on a breach of the Toledano Lefkowitz Agreement. When asked at the first meeting of creditors to identify the source of his authority in the Toledano Lefkowitz Agreement, Ziss demurred stating that whether he had authority was a legal question for the Court.

38. When asked at the 341 meeting to explain why he listed "designee of Raphael Toledano" as the Debtor's sole member instead of 22 Columbus on the Schedule of Equity Security Holders (Exhibit P), Ziss said that he believed the transfer to 22 Columbus was "fraudulent," so he was entitled to list the "rightful" member. And again, whether this was allowed is a legal question for the Court.

39. Ziss' reliance on the Toledano Lefkowitz Agreement, and his belief that there was fraud in the transfers of the Debtor's Membership Interests and the Property does not justify filing this bankruptcy. If Ziss, as Toledano's designee, believes Toledano's rights were violated under the Toledano-Lefkowitz Agreement, he could pursue any *legal* remedy available to unwind the transfers. But filing an unauthorized bankruptcy is *illegal.*

40. In summary, the Local Rule Affidavit (Exhibit M, paragraph 11) and Ziss' testimony at the 341 meeting show that Ziss understood when he signed the Petition that 22 Columbus holds the Debtor's membership interests, and that Michael Shah is the Debtor's

manager. Filing an unauthorized bankruptcy petition aginst a perceived adversary as retaliation for a perceived breach of contract is sanctionable.

41. By this motion, the Movant is not seeking sanctions, but the Movant reserves its right to do so, and requests that if this motion is granted, the Court retain continuing jurisdiction to hear a sanctions motion.

42. No prior application has been made for the relief sought herein.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein, and such further relief as may be just and proper.

Dated: New York, New York
September 10, 2017

BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for the Debtor

By: s/Mark Frankel
800 Third Avenue
New York, New York 10022
(212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re Chapter 11

97 2nd LLC Case no. 17-74756

Debtor.
-----------------------------------------------------x
STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

Michael Shah deposes and says under penalty of perjury, as follows:

1. I am the Manager of 97 2nd LLC (the "Debtor").

2. I am submitting this statement in support of the Debtor's motion to dismiss this case.

3. The facts in the Debtor's motion are true and correct to the best of my knowledge, information and belief.

Dated: New York, New York
September 10, 2017

s/Michael Shah