UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                        Chapter 11

97 2ND LLC,                                                   Case No. 17-74756 (REG)

                            Debtor.

-------------------------------------------------------------x

### DEBTOR'S MEMORANDUM OF LAW
### IN SUPPORT OF RAPHAEL TOLEDANO'S AUTHORITY
### TO CAUSE THE DEBTOR'S CHAPTER 11 FILING

### PRELIMINARY STATEMENT

The Debtor herein, 97 2nd LLC (the "Debtor") respectfully submits this Memorandum of Law to establish that Raphael Toledano retained the requisite authority to cause the Debtor's Chapter 11 filing on August 3, 2017. Accordingly, the Court should deny the motion to dismiss the Chapter 11 case filed by Michael Shah, who improperly claims to be the Debtor's current manager.

### Framework for Toledano's Authority

The Debtor faces the unusual prospect of two different camps contending to be in control of the Debtor entity. On the one hand, Raphael Toledano ("Toledano") was the founding member and manager of the Debtor, who pledged his 100% membership interest as collateral security for a personal loan issued by Lefko Funding LLC ("Lefko Funding") pursuant to Pledge Agreement dated April 23, 2015 (the "Pledge"). A copy of the Pledge is annexed hereto as Exhibit "A".

In April 2017, Lefko Funding allegedly foreclosed on this Pledge following a purported loan default. The foreclosure was conducted by Lefko Funding's attorney under a non-judicial Article 9 sale process. In turn, two months later, on June 20, 2017, Lefko Funding purportedly

1

assigned the Toledano membership interest to entities controlled by Michael Shah ("Shah"). The

assignment came the day <u>after</u> Lefko Funding entered into an agreement with Toledano on June

19, 2017 (the "Letter Agreement"), conferring upon Toledano, or his designee, the exclusive

rights to sell and manage the Debtor's real property at 97 Second Avenue, New York, NY (the

"Property"). A copy of the Letter Agreement is annexed hereto as <u>Exhibit</u> "B", provides in

relevant part:

> The parties hereby agree that Raphael Toledano or his designee shall be appointed
> as the manager of the building of the 2nd Avenue Property, which shall include the
> right to manage and maintain the building and collect all rents from tenants
> located at the 2nd Avenue Property (the "2nd Avenue Management Rights"),
> provided that, Toledano or his designee shall perform all such duties in
> compliance with all applicable laws. Lefkowitz shall have the right to terminate
> the 2nd Avenue Management Rights following the expiration of the Sale Period
> (as defined below).
>
> In connection with the sale of the Pledged Equity or the 2nd Avenue Property (the
> "2nd Avenue Sale"), Benjamin Lefkowitz and any of his affiliates agree to the
> following: (A) fully cooperate with any reasonable requests in connection with
> the execution of any further documents or instruments or take other reasonable
> steps necessary to effectuate the 2nd Avenue Sale; B) upon written notice from the
> attorneys stating that the proposed 2nd Avenue Sale is scheduled to be
> consummated within twenty-four (24) hours, Benjamin Lefkowitz shall procure
> and deliver documents evidencing the release and/or satisfaction of (1) Agreement
> and Restriction by and among Raphael Toledano, Abraham Lokshin, Naum
> Lokshin, and A&N Funding Co. LLC and corresponding UCC Filing (Recorded
> at CRFN: 2017000070355 and 2017000064606); and (2) Contract of Sale, by and
> between, Michael Taubenblat and 97 2nd LLC (Recorded at CRFN
> 2015000089977); (C) for a period of seventy-five (75) days from the date hereof
> (the "Sale Period") of Yaron Kornblum of Rivkin Radler shall exclusively
> negotiate and prepare the final definitive documents for the 2nd Avenue Sale; and
> (D) the proceeds of the 2nd Avenue Sale shall be paid to Rafael Toledano or his
> designee in accordance with Section (vi) below.

*See,* <u>Exhibit</u> "B" at Sections (c)(iv) and (c)(v).

In bankruptcy, the Debtor commenced an adversary proceeding against Shah and his

affiliates challenging the legitimacy of Shah's claimed accession to management authority of the

Debtor. The adversary complaint seeks a declaratory judgment finding, *inter alia*, (i) Toledano

has a valid and binding agreement giving him managerial authority; and (ii) that Shah and his affiliates have interfered with the Debtor's and Toledano's power to manage and sell the Debtor's property.

Not surprisingly, Shah disagrees with the Debtor's contentions, and has moved to dismiss the Chapter 11 case, alleging that he is now the current manager, having appointed himself to this position following the assignment of Lefko Funding's position on June 20, 2017.

The Court has requested specific briefing on the threshold question of whether Toledano or Shah has authority to control the Debtor. The question of authority is a clear "gating issue" governing disposition of Shah's dismissal motion.

### Defects with Shah's Alleged Authority

Shah badly overstates the scope of his purported management rights in two material respects. First, Shah assumes that a secured creditor, such as Lefko Funding, automatically obtains management rights over the Debtor by virtue of the foreclosure of Toledano's membership interest. In making this assumption, Shah fails to provide any analysis of the implications of the New York Limited Liability Company Law ("LLCL"), and specifically, LLCL §603(a)(2), (3) and (4). These provisions establish and recognize the basic principle that the assignment of a membership interest in a limited liability company relates to economic rights only, which are separate and distinct from management rights. *See, Greenstreet Fin., L.P. v. CS-Graces, LLC*, No. 07 CIV. 8005 KNF, 2011 WL 7555324 (S.D.N.Y. Apr. 18, 2011).

Under the LLCL, unless the Debtor's underlying operating agreement provides to the contrary (which it does not), Toledano's Pledge to Lefko Funding created a security interest in Toledano's economic rights as a member, and did not confer management authority by dint of

the ensuing UCC sale.   Indeed, pursuant to the Pledge, the term "Pledge Collateral" is specifically defined in economic terms:

> "Pledged Collateral" means all right, title and interest in and to the Pledged Interest, whether now owned or existing or hereafter acquired, including, without limitation, all rights of the Pledgor to receive any income, dividends, or other distributions therefrom and all proceeds thereof including, without limitation, proceeds received from any sale, financing or refinancing of an assets owned by the Company, and all products, substitutions, additions, changes and replacements thereof.

*See,* Pledge, annexed hereto as <u>Exhibit</u> "A", at ¶1(c).

Thus, at best, Shah acquired an economic interest in the economic rights associated with Toledano's equity interest, but the foreclosure itself did not unseat Toledano from management. *See, e.g. Born to Build, L.L.C. v. Saleh*, 43 Misc. 3d 1213(A), 988 N.Y.S.2d 521 (Sup. Ct. 2014)("A plain reading of Sections 603(a) and 607 of the Limited Liability Company Law make it clear that, at best, a creditor, such as the plaintiff, may only obtain an interest in a member's share of the profits and losses of a limited liability company, not the membership interest itself.").

<u>Second</u>, even if management rights could be conveyed through a UCC foreclosure sale, Lefko Funding gave them right back to Toledano pursuant to the Letter Agreement.   Daniel Webster argued, in a phrase that became the philosophical underpinnings of Chief Justice John Marshall legendary decision in in *McCulloch* v. *Maryland*: "the power to tax involves the power to destroy . . . ." 17 U.S. 327, 431 (1819).

In this context, Toledano's exclusive and unfettered power to manage and sell the Debtor's property for Toledano's sole personal benefit also involves the power to commence a Chapter 11 case.   Importantly, in giving Toledano the sole right to sell the Property, neither Benjamin Lefkowitz nor Lefko Funding ever designated themselves as the managing member or

reserved any management authority for themselves. To the contrary, the Letter Agreement required that Mr. Lefkowitz fully cooperate with Toledano in effectuating a sale of the Property. Shah and his affiliate are bound by the Letter Agreement since they acquired the assignment of the membership interest after the Letter Agreement had been executed, and with knowledge of its contents.

## BACKGROUND FACTS

The Debtor was organized in April 2014 as a New York limited liability company to acquire the Property, which is improved by a residential apartment building occupied by approximately nine (9) residential tenants and one (1) commercial tenant.

Since 2014, the Debtor was singularly owned and managed by Toledano, who served as its sole manager and member, pursuant to the Operating Agreement dated April 8, 2014. The Operating Agreement was amended on July 21, 2015 to include certain single purpose entity type provisions including the appointment of an independent director. Copies of the Operating Agreement and First Amendment are collectively annexed hereto as Exhibit "C".

### (A) Lefko Funding's personal loans to Toledano

In 2014, Toledano obtained certain personal loans from Lefko Funding totaling $2,000,000 (the "Lefko Personal Loans"). The Lefko Personal Loans were secured, *inter alia*, by a pledge of 100% Toledano's membership interest in the Debtor. Notwithstanding the Pledge, Toledano continued to retain all rights of a member so long as no Event of Default has occurred or is continuing. *See,* Exhibit "A", Sections 5 and 6. Yet, even after an Event of Default, Toledano still retains full management rights unless and until notice is sent, as required by Section 5, which provides as follows:

> So long as no Event of Default (hereinafter defined) has occurred and is
> continuing, Pledgor may exercise any and all management and other membership
> rights associated with the Pledged Collateral, During the continuance of an Event

5

of Default, all rights of the Pledgor to exercise any such voting, consent and other rights shall cease immediately upon the sending of notice by Pledgee of Pledgor, and all such rights thereupon shall become vested solely and exclusively in Pledgee, automatically without any action by any Person.

Exhibit "A" at Section 5. There is no evidence that notice was ever sent by Lefko Funding or Shah cutting off Toledano's management authority, which continued unabated.

A purported UCC auction sale was conducted by Lefko Funding on April 4, 2017. According to the auction transcript, the auction was first scheduled for February 28, 2017. However, there is no explanation as to why the auction sale was adjourned from February 28, 2017 to April 4, 2017. Nor does it appear from the transcript that Lefko Funding provided publication notice of the April 4, 2017 adjourned auction sale. No one attended the April 4, 2017 auction except Benjamin Lefkowitz, and Lefko Funding's lawyer unilaterally declared that the Toledano's membership interest was sold to Lefko Funding. A copy of the transcript is annexed hereto as Exhibit "D".

In the midst of the suspect UCC foreclosure process, Shah and his affiliates came onto the scene. Shah is a well-known real estate investor trading in distressed assets. In this case, he acquired the mortgage debt on April 17, 2017 through an affiliate known as DS 97 2nd Ave Note Purchaser LLC. Although all of the specifics relating to the connection between Shah and Lefko Funding are not yet fully known without discovery, it appears that Shah negotiated with Benjamin Lefkowitz to acquire Toledano's membership interest before the auction sale occurred[1] under a series of transactions that did not confer management authority.

---

[1]   The interests in Columbus were acquired by Shah in stages. First, on March 15, 2017, Benjamin Lefkowitz and his brother, Samuel, each holders of 50% membership interests in Columbus, transferred 49.5% of their respective interests to Griffon V, LLC ("Griffon"), an entity owned by Shah. On June 20, 2017, the day after the execution of the Letter Agreement, the Lefkowitz brothers each transferred their remaining 0.5% interests in Columbus to Griffon. Also on June 20, 2017, Lefko Funding assigned its rights against the Debtor to Columbus.

For example, in the UCC transfer statement filed with the New York County Clerk on July 10, 2017, Lefko Funding indicated that it exercised "post-default remedies" with respect to certain collateral defined as economic rights associated with Toledano's membership interest, which was assigned to 22 Columbus Avenue LLC ("Columbus"). There is no specific mention in the transfer statement that management rights were foreclosed upon or subsequently assigned to Columbus. A copy of the transfer statement is annexed hereto as Exhibit "E".

## LEGAL ARGUMENT

### POINT I
### TOLEDANO RETAINED SUFFICIENT MANAGEMENT AUTHORITY TO COMMENCE THE CHAPTER 11 CASE

**(A)    Management Authority Generally**

The issue of authority to commence a Chapter 11 case is certainly not foreign territory for this Court. In an analogous situation involving a dispute between two members of a limited liability company over authority to file a Chapter 11 petition, this Court held in *In re East End Development, LLC*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013), that unless the operating agreement expressly restricts a single member's authority to file a bankruptcy petition, such a restriction cannot be inferred or implied simply because the power to liquidate or dissolve requires unanimous membership consent. The essential framework for determining proper authority to commence a Chapter 11 case was addressed by the Court as follows:

> the Court must determine whether the Managing Member possessed the requisite authority to file the petition in bankruptcy on behalf of the Debtor. The Supreme Court has opined that with respect to corporations, the entity vested with "the power of management" has the requisite authority to file a bankruptcy petition. *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945). State law governs whether a business entity is authorized to file a petition in bankruptcy. *In re Am. Globus Corp.*, 195 B.R. 263, 265 (Bankr.S.D.N.Y.1996); *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr.D.Or.2003). Therefore, if the Managing Member did not have the authority to file the petition pursuant to applicable state law, then the Debtor's case is subject to dismissal. *In re Raljoed*

7

> *Realty Co.,* 277 F.Supp. 225, 226 (S.D.N.Y.1967) *aff'd per curiam sub nom. In re Park Towers Corp.,* 387 F.2d 948 (2d Cir.1967). The Debtor is a New York limited liability company, and resolution of this issue is governed by New York state law. Under New York Limited Liability Company Law, the LLC's operating agreement governs the parties' conduct. To the extent the agreement is silent, there are default provisions in the New York Limited Liability Company laws that apply. *639 *Overhoff v. Scarp, Inc.,* 12 Misc.3d 350, 359, 812 N.Y.S.2d 809 (N.Y.Sup.Ct.2005).

*Id.*, at 638–39.

This Court ultimately held in *East End Development, supra,* that the power to liquidate or dissolve a company is not equivalent to the filing of a bankruptcy petition, which more resembles "an act to bring or defend, settle, pay, collect, compromise, arbitrate, resort to legal action, or other adjust claims or demands of or against the Debtor", citing the language of the operating agreement in that case. *Id.*, at 640. Accordingly, the Court did not require unanimous consent for filing a Chapter 11 case.

The same approach should apply here, since all power resides in the manager of the Debtor, and the Operating Agreement and First Amendment specifically name Toledano as the manager. Toledano's enumerated powers as manager include the authority to "execute any and all documents on behalf of the Company necessary and appropriate in connection with the acquisition, financing, operation, management or development of the business and any property of the Company." *See,* Exhibit "C", Operating Agreement at Article 5.

**(B)    Toledano Retained Managerial Authority Notwithstanding the UCC Foreclosure Sale**

Ignored by Shah in his motion is the fact that the collateral pledge of Toledano's membership interest related only to economic rights and did not cover management authority or voting rights. Section 603(a) of LLCL, denominated "Assignment of a membership interest," provides in relevant part:

8

Except as provided in the operating agreement,

> (1) a membership interest is assignable in whole or in part;
>
> (2) an **assignment** of a membership interest **does not** dissolve a limited liability company or **entitle the assignee to participate in the management and affairs of the limited liability company or to become or to exercise any rights or powers of a member**;
>
> (3) the **only effect** of an assignment of a membership interest is to **entitle the assignee to receive**, to the extent assigned, the **distributions and allocations of profits and losses** to which the assignor would be entitled; and
> (4) a member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of his or her membership interest. Unless otherwise provided in the operating agreement, **the pledge of, or the granting of a security interest, lien or other encumbrance in or against, any or all of the membership interest of a member shall not cause the member to cease to be a member or to cease to have the power to exercise any rights or powers of a member.**

N.Y. LLC Law § 603(a) (emphasis added).

There is nothing in the Debtor's Operating Agreement or the First Amendment modifying the provisions of Section 603. Thus, the dichotomy under the LLCL between a pledge of the economic rights as opposed to management interests remains in effect, consistent with the analysis employed by the Court in *Greenstreet Fin., L.P. v. CS-Graces, LLC, supra*:

> New York LLCL § 603 divides a membership interest in a limited liability company in two parts: (1) the management, voting and membership rights of a membership interest, which can be referred to as the non-economic interest; and (2) rights to distributions, profits and losses, which can be referred to as the economic interest. Thus, pursuant to New York LLCL § 603, the economic interest is freely transferable by pledging it or granting a security interest in it, but the non-economic interest is not. Unless otherwise provided in the operating agreement, the non-economic interest cannot be pledged or granted as a security interest. *See* New York LLCL § 603(a)(4). This means that, when the fifty percent membership interest in RH Lodging was granted as a security interest in the Smul Trust's membership interest, the Smul Trust, which granted the security interest, remained a member of RH Lodging and retained the power to exercise any rights or powers of a member. *See* New York LLCL § 603(a)(4). Contrary to the plaintiff's position that "[b]y foreclosing on the Smul Security Interest,

9

Greenstreet will stand in the shoes of an assignee," no assignment of the membership interest occurred here, only a security interest in the membership interest in RH Lodging was granted to Greenstreet. Therefore, if the plaintiff were to foreclose on its membership interest in RH Lodging, it will acquire the Smul Trust's economic interest only, not: (a) the trust's rights to participate in RH Lodging's management; (b) its voting rights; or (c) any other of the Smul Trust's non-economic membership rights.").

*Id.*, at \*10.  *See, also, In re Albright*, 291 B.R. 538 (Bankr. D. Colo. 2003) (finding that the Chapter 7 trustee stepped into the debtor's shoes to take both the economic <u>and</u> the managerial interests of the debtor in an LLC, empowering the trustee to liquidate the assets of LLC for the benefit of creditors); *Born to Build, L.L.C. v. Saleh, supra*, 43 Misc. 3d 1213(A).

By virtue of the implications of the LLCL, even after the UCC foreclosure sale, Toledano still retained his managerial powers.  Notably, there is nothing in the LLCL or case law which changes this analysis merely because Toledano is the sole member of the Debtor.  Section 603 makes no distinction as to the treatment of collateral assignments as between single member or multiple member New York limited liability companies.  In either circumstance, Toledano retained management authority notwithstanding the UCC sale.  Likewise, Lefko Funding or its successor cannot even attempt to become a full-fledged member with management rights without the consent of the independent director for purposes of LLCL §604.  Neither Lefko Funding nor Shah ever sought such consent, and thus the foreclosure did not work a change in Toledano's status as manager.

## POINT II
## LEFKO FUNDING RE-GRANTED MANAGERIAL POWER TO TOLEDANO

**(A)    The Letter Agreement Placed Managerial Authority in Toledano**

Assuming, *arguendo*, that upon the UCC sale, Toledano's managerial powers in the Debtor were somehow conveyed to Lefko Funding despite the provisions of the LLCL, Toledano nonetheless promptly recaptured those management rights by virtue of the Letter Agreement.

As noted in the adversary complaint, to avoid litigation, Lefko Funding and Benjamin Lefkowitz gave Toledano management authority over the Property so that Toledano could effectuate a sale of the Property.

In his Motion, Shah asserts that the Letter Agreement was not effective because it is signed by Mr. Lefkowitz personally, rather than by Lefko Funding. This type of hair splitting over signatures is contrary to the LLCL, which provides in Section 412(a) that:

> Unless the articles of organization of a limited liability company provide that management shall be vested in a manager or managers, every member is an agent of the limited liability company for the purpose of its business, and the act of every member, including the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business of the limited liability company, binds the limited liability company, unless (i) the member so acting has in fact no authority to act for the limited liability company in the particular matter and (ii) the person with whom he or she is dealing has knowledge of the fact that the member has no such authority.

Here, to the extent that the Letter Agreement was signed by Mr. Lefkowitz, he was plainly acting as agent for Lefko Funding. Thus, the Letter Agreement is enforceable based actual, constructive and apparent authority conferred on Mr. Lefkowitz. *See, e.g., Thomas Nassau County Huszar v. Bayview Park Properties LLC*, 109 A.D.3d 922 (2d Dep't 2013). In *Thomas*, the Supreme Court held that the zoning board lacked jurisdiction to entertain applications for variance which were executed by the individual member of the LLC property owner, rather than in the name of the LLC itself. The Appellate Division reversed, holding that "the Board was clearly aware that the owner of the property was Bayview, and that Seeman was acting on its behalf", such that Seeman's actions were those of an authorized agent under Section 412(a) of the LLCL. *Id.*, at 924.

**(B)     The Managerial Powers and Sale Powers Granted to Toledano Included the Authority to File a Chapter 11 Petition**

As this Court noted in *East End Development*, *supra*, the Supreme Court has long held that the "the entity vested with the 'power of management' has the requisite authority to file a bankruptcy petition. *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945)". *East End Development, supra*, 491 B.R. at 638. Here, the power of management is vested in Toledano or his designee.

In his Motion, Shah attempts to make a distinction between exclusive management over the Property, as opposed to corporate governance. However, this is a distinction without a difference for purposes of authority to proceed with a Chapter 11 case.

First, the grant of authority to manage the Property specifically includes the right to collect rents. It has been held, in the context of a receiver, that the power to collect rents includes the power to bring suit in the furtherance of collection, without the necessity of a specific line item of authority. *See, Padernacht v. Doe*, 38 Misc. 3d 825, 829 n. 13 (New York City Civ. Ct. 2012) ("'power to collect rents and manage property includes the inherent power and authority to take whatever legal steps are necessary to enforce collection of such rents, including the power to institute summary proceedings[,] [and this section] authorizes the receiver of a landlord, purchaser or other person so entitled to apply, to institute a summary proceeding when authorized by court' (*Cubita v Westchester Furniture Exch.*, 88 Misc. 2d 497, 498 [1976] [internal quotation marks omitted])"). There is no reason why this same analysis does not apply to the situation here.

Additionally, the unfettered power to manage real property necessarily includes the power to incur debt and pay creditors in connection with that management. In sum, the right to

12

manage a company's debtor/creditor relationships must also carry with it the right to reorganize that debt through a Chapter 11 case.

Moreover, the Letter Agreement also gave Toledano complete control over the sale of the Debtor's sole asset, *i.e.*, the Property. Toledano and his designee were given sole authority over every aspect of the sale, including the power to identify the buyer, set the purchase price, and, most importantly, receive 100% of the proceeds of the sale. Mr. Lefkowitz and Lefko Funding did not reserve any rights regarding the sale or management of the Property whatsoever, except as regards his duty to execute those sale documents which are provided to him by Toledano's attorney, Yaron Kornblum, Esq. of Rivkin Radler, who is charged with preparing the sale documents.

The authority to manage the Property, collect the rents that make up the Debtor's sole income, including bringing suit where necessary, oversee the Debtor's relationships with its creditors, and sell the Debtor's sole asset necessarily encompasses exactly the type of management authority identified by this Court in *East End Development* as tantamount to the power to file bankruptcy, and as contemplated by the Supreme Court when it stated in *Price v. Gurney*, 324 U.S. 100, 104, 65 S. Ct. 513, 515 (1945) that "the initiation of the proceedings, like the run of corporate activities, is left to the corporation itself, i.e. to those who have the power of management."

Accordingly, the letter and the spirit of the Letter Agreement conferred proper authority on Toledano to appoint a chief restructuring officer and cause the Chapter 11 filing, particularly since Mr. Lefkowitz and Lefko Funding did not reserve any residual control or authority, could not otherwise become full-fledged members by virtue of a foreclosure under LLCL §603, and effectively turned the "keys" to the enterprise over to Toledano and his designee.

**CONCLUSION**

For all of the above reasons, the Debtor respectfully prays for the entry of an Order

denying Shah's dismissal motion.

Dated: New York, New York
October 18, 2017

                                        GOLDBERG WEPRIN FINKEL
                                        GOLDSTEIN LLP
                                        Proposed Attorneys for the Debtor
                                        1501 Broadway, 22nd Floor
                                        New York, New York 10036
                                        (212) 221-5700


                                        By:    /s/ Kevin J. Nash